1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15

| | |
|---|---|
| **AMBER CHEMICAL, INC., a California corporation,**<br><br>         **Plaintiff,**<br><br>             **v.**<br><br>**REILLY INDUSTRIES, INC., an Indiana corporation,**<br><br>         **Defendant.** | **1:06-CV-06090 OWW SMS**<br><br>**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.** |

16

## I.   INTRODUCTION

17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Amber Chemical ("Amber") filed suit in the Superior Court for the County of Kern against Defendant Reilly Industries ("Reilly"), for damages arising out of an alleged breach of a requirements contract for the delivery of chemical products.  (*See* Doc. 1.)  Reilly removed the case to federal court on the basis of diversity jurisdiction.  (*Id.*)  Before the Court for decision is Defendant Reilly's motion for summary judgment.  (Doc. 19, filed Aug. 19, 2005.)  Amber filed opposition (Doc. 20, filed Sept. 8, 2005), and Reilly replied (Doc. 22, filed Oct. 31, 2005).

1

## II.  <u>BACKGROUND</u>

2    Amber is a wholesale commodity chemical company that

3 specializes in selling chemical inputs to oil field service

4 companies, but has recently expanded to also distribute chemicals

5 to agricultural businesses.  (Deft's Statement of Undisputed

6 Facts ("DSUF"), Doc. 19-2 #3.)

7    Historically, the relationship proceeded in the following

8 manner.  In the fall of each year, Reilly would provide Amber

9 with firm prices for potassium chloride for the following year.

10 (Plaintiff's Statement of Disputed/Undisputed Fact ("PSF"), Doc.

11 20 #27.)  Amber then agreed to purchase a minimum annual quantity

12 of potassium chloride from Reilly at that agreed upon price,

13 unless Reilly was unable to meet Amber's needs.  (DSUF #1.)

14 Logistically, Amber would not order and pay for their annual

15 volume of potassium chloride all at once.  Rather, Amber placed

16 periodic orders, depending on its needs during any given time

17 period.  Amber submitted purchase orders for the purchase of each

18 shipment of potassium chloride.  (DSUF #5.)  Once Reilly received

19 a purchase order from Amber, Reilly then processed that order and

20 shipped the product.  (DSUF #7.)

21    It is undisputed that Reilly shipped the product to Amber

22 along with a standard invoice, which set forth standard terms and

23 conditions ("Standard Terms"), including the condition that the

24 invoice and the terms and conditions constitute the parties'

25 entire agreement and that the terms could only be amended,

26 modified or revised through a written document executed by the

27 parties.  (DSUF ## 7-9.)  However, Amber employees, Bob Brister

28 and Sandra Kay Newman, testified that they had no knowledge of

**2**

these standard terms and conditions.  (Amber's Response to DSUF ## 7-9; Brister Decl. at ¶¶ 17, 19; Brister Depo. at 142-144; Newman Depo. at 13-14.)

Amber believed that it was obligated to purchase all of its requirements for potassium chloride from Reilly, unless Reilly was unable to supply.  On occasion, Reilly would be unable to meet Amber's needs for short periods of time as a result of logistical problems or other reasons.  On one occasion, Reilly was unable to meet Amber's needs for several months.  On these occasions, Amber contracted with Mississippi Potash to provide replacement potassium chloride.  Amber, however, believed that it should always give Reilly, in substance, a right of first refusal whenever it contemplated contracting with Mississippi Potash.  On occasion, when informed of Amber's intent to obtain replacement material from Mississippi Potash, Reilly attempted to deliver potassium chloride to Amber by alternative means.  (Brister Depo. 49, 81-82.)

Reilly contends that its relationship with Amber ended in March 2004, when Reilly sold its potassium chloride business to another vendor.  (DSUF #2.)  Amber maintains that during the fall of 2003, through a series of e-mails between Reilly employee Brett Wilhelm and Amber employee Bob Brister, an agreement was reached whereby Reilly would sell Amber potassium chloride throughout 2004 at a fixed price of $122.50 per ton, so long as the volume of potassium chloride purchased by Amber from Reilly met or exceeded the volume it purchased from Reilly in 2003.  The relevant exchange of e-mails, the authenticity of which is not disputed, begins with an e-mail from Brett Wilhelm at Reilly to Bob Brister at Amber:

From: Wilhelm, Brett
Sent: Friday, September 12, 2003 5:16 PM
To:  'bbaci5201@aol.com'
Subject: 2004 pricing

Bob,

As I mentioned to Kay on the phone, I'd be willing to
work out a contract with you for the upcoming year we
hold the material pricing, but push through the
increase in retail rate (4%).  This would account for
approximately $1.00 - $1.50 a ton increase.  If the
volume remains the same, or increases, this would be
something I'd be willing to do to maintain our
partnership.  Let me know if this works for you for the
upcoming year and if it is something that will work for
Amber.  The key for us is to maintain and build upon
our relationship.  We ordered five more Hopper cars
today to help alleviate some of the bumps that have
occurred on the supply side in the past.  I'm in the
office all next week, so give me a call and we can
discuss this proposal.  Have a great weekend!

Sincerely,

Brett Wilhelm,
Reilly Industries, Inc.

     On September 15, 2003, Bob Brister at Amber sent the

following e-mail to Brett Wilhelm at Reilly:

From: ACIBB5201@aol.com
Sent: Monday, September 15, 2003 2:44 PM
To: BWilhelm@reilyind.com
Subject: Re: FW: 2004 pricing

Brett
looks good to me please work the contract up
bob
amber

     Brett Wilhelm at Reilly responded to the above message as

follows:

Subject: Re: FW: 2004 pricing
Sent: 9/15/033 1:02:36 PM Pacific Standard Time
From:  BWilhelm@reilyind.com
To: ACIBB5201@aol.com

Bob,

What type of volume are you committing to?  Will it
[at ] least be the same as 2003?

Brett

(Decl. of Bobby Brister, Doc. 20, Ex. A (formatting modified).)

At some point, either during or following this exchange of e-mails, Wilhelm called Brister to confirm the quantity of potassium chloride Amber intended to purchase from Reilly in 2004.  (PSF #36.)  Brister orally confirmed that Amber would purchase at least as much or more potassium chloride from Reilly as it had in 2003.  (PSF #37.)  However, the alleged agreement was never reduced to writing.  In fact, at no point during the course of Amber and Reilly's business relationship did the two companies ever execute a formal written contract reflecting any long term contractual arrangement.  (PSF #26.)

It is undisputed that, throughout the early part of 2004, up until March 15, 2004, the date on which Reilly cut off shipments to Amber, Amber bought all of its requirements for potassium chloride from Reilly, and that these purchases were in excess of the quantities it bought in 2003.

Reilly concedes that Amber intended to rely on the firm price quoted by Reilly to enter into contracts with Amber's customers.  (PSF #29.)  Reilly also concedes that if Amber was unable to meet its commitments, both as to supply and price, this would pose a "very big problem" for Amber.  (PSF #30.)  When the e-mail exchange between Wilhelm and Amber took place in the Fall of 2003, Wilhelm knew Reilly was negotiating a sale of its potassium chloride business.  (PSF #31.)

Amber relied upon Reilly's alleged promise by entering into contracts with its own customers based on the quoted price.  (PSF #32.)  Amber suffered damages as a result of Reilly's failure to supply potassium chloride at the allegedly agreed-upon price.

**5**

(PSF #33.)

### III.   __STANDARD OF REVIEW__

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ.P. 56(c); *Cal. v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material. *Id.* A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986). Facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell,* 138 F.3d at 782 (*quoting Anderson*, 477 U.S. at 248).

The non-moving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at

trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more implausible the claim or defense asserted by the non-moving party, the more persuasive its evidence must be to avoid summary judgment.  *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1996).  Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir.1996).

## IV.  ANALYSIS

### A.   Formation of a Contract

#### 1.   Formation of a Written Contract/ Statute of Frauds Requirement.

Section 2201 of the California Commercial Code ("the Code") provides in relevant part as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker.  A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in the writing.

Cal. Comm. Code § 2201(1) ("Formal requirements; statute of frauds").

The statute of frauds covers contracts for the sale of goods

over $500.  Goods means "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities...and things in action."  Cal. Com. Code § 2105(1).  Potassium chloride is a "thing" and is therefore a "good" for purposes of the statute of frauds.  It is undisputed that alleged contract, if formed, was for more than $500 worth of potassium chloride.  Therefore, the alleged requirements contract must conform to the statute of frauds in order to be enforceable.

Plaintiff alleges that the series of e-mails between authorized agents of Amber and Reilly establish an enforceable contract.  A contract within the statute of frauds is enforceable "if it is evidenced by any writing, signed by or on behalf of the party to be charged, which [1] reasonably identifies the subject matter of the contract, [2] is sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and [3] states with reasonable certainty the essential terms of the unperformed promises in the contract."  Rest. 2d. Contracts, § 131.

Here, the statute of frauds is not satisfied because the e-mails do not sufficiently "indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party."  Generally, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  1 Witkin Cal. Summ., Ch. I, Contracts § 125 (10th ed. 2005).  Similarly, section 26 of the Second Restatement of Contracts states:

> A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.

(quoted in 1 Witkin, Contracts § 130.)

The e-mail of September 12, 2003, from Brett Wilhelm, the manager of Reilly's brine division, to Bob Brister, Amber's president, reads in relevant part:

> ...I'd be willing to work out a contract with you for the upcoming year we hold the material pricing, but push through the increase in retail rate (4%). This would account for approximately $1.00 - $1.50 a ton increase. If the volume remains the same, or increases, this would be something I'd be willing to do to maintain our partnership. Let me know if this works for you for the upcoming year and if it is something that will work for Amber. The key for us is to maintain and build upon our relationship. We ordered five more Hopper cars today to help alleviate some of the bumps that have occurred on the supply side in the past. I'm in the office all next week, so give me a call and we can discuss this proposal. Have a great weekend!

(emphasis added.)

This e-mail did not constitute an offer because it merely invited the parties to "work[] out a contract," that would be reduced to writing, and evidenced only a willingness to "discuss this proposal." Wilhelm did not "intend to conclude a bargain until he [had] made a further manifestation of assent." As such, this e-mail it is no more than an invitation to negotiate.

On September 15, 2003, Brister replied on behalf of Amber: "[L]ooks good to me[.] [P]lease work the contract up[.]" Since Wilhelm's prior e-mail did not constitute an offer, it did not create the power in Brister to accept. Nor does Brister's reply purport to actually be an acceptance. Rather, Brister indicates that Reilly should "work the contract up." This language evidences an understanding that no contract yet existed and that

Amber intended that any contract be reduced to writing.  No written contract was ever prepared.

The final e-mail in this series is Wilhelm's response to Brister's reply: "What type of volume are you committing to? Will it be the same as 2003?"  This specifically indicates that Brister had not offered a specified quantity in his e-mail, and Wilhelm needed to establish this term with certainty before making the offer of the quoted price.  No evidence of a written reply by Brister was submitted.

The writings in evidence do not indicate that a contract was formed, as there was no offer and acceptance.  Therefore, unless the statute of frauds is excused or an exception applies, the alleged agreement is unenforceable.

### 2. Exception to the Statute of Frauds for Certain Oral Agreements.

Although the e-mails do not themselves establish that a written contract for sale was formed, California's Commercial Code provides several ways in which an oral agreement may satisfy the statute of frauds.  Cal. Comm. Code. § 2201(2)-(3). Potentially relevant in this case is Section 2201(3)(b), which provides: "A contract which does not satisfy the requirements of [the statute of frauds] but which is valid in other respects is enforceable...[i]f the party against whom enforcement is sought admits in his or her pleading, testimony, or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted..." (emphasis added).

Although Mr. Wilhelm of Reilly admitted to providing a firm price to Amber in the fall of 2003 for 2004 (Wilhelm Depo. 107-

**10**

108), Wilhelm nowhere admits that a contract or a requirement contract was made between the parties. This, is insufficient to satisfy Section 2201.

**B. <u>Promissory Estoppel</u>.**

Amber asserts that Reilly should be estopped from disclaiming the existence of a contract because Reilly made an oral promise to Amber upon which Amber relied to its detriment.

California Commercial Code section 1103(b) states "[u]nless displaced by the particular provisions of this code, the principles of law and equity, including...estoppel...supplement its provisions." Estoppel serves as "one further exception to imposition of the statute of frauds." *Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432, 444 (1988). The California Supreme Court has held:

> The doctrine of estoppel to assert the statute of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances. Such fraud may inhere in the unconscionable injury that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract...."

*Monarco v. Lo Greco*, 35 Cal. 2d 621, 623 (1950).

> The doctrine of estoppel is proven where one party suffers an unconscionable injury if the statute of frauds is asserted to prevent enforcement of oral contracts. Unconscionable injury results from denying enforcement of a contract after one party is induced by another party to seriously change position relying upon the oral agreement. It also occurs in cases of unjust enrichment.

*Allied*, 203 Cal. App. 3d at 434. Application of the doctrine is ordinarily a question of fact. *Byrne v. Laura*, 52 Cal. App. 4th 1054, 1068 (1997)(citing *Phillippe v. Shapell Industries*, 43 Cal. 3d 1247, 1272 (1987)(Kaufman, J dissenting)).

**11**

### 1.   Promise.

The threshold question is whether any oral agreement was reached between the parties prior to Amber's detrimental reliance.  To be binding for purposes of promissory estoppel, the promise must be "clear and unambiguous." *Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1185-86 (1998)(reviewing numerous cases and treatises that so hold).

Plaintiff alleges that an oral requirements contract was formed here.  Requirements contracts "have been enforced by the courts with little difficulty, where the surrounding circumstances indicate the approximate scope of the promise." *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal. 3d 752, 763 (1984)(overruled on other grounds by *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85 (1995)).  A specific quantity term is not required if quantity may be measured by the requirements of the buyer or if the contract is for exclusive dealings.  California Commercial Code section 2306 provides:

> (1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.
>
> (2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

Comment 3 to section 2306 specifically addresses the import of a minimum quantity term:

> If an estimate of output or requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any

> minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

Here, Bob Brister testified that the e-mails exchanged in September 2003 and a contemporaneous phone conversation between Mr. Brister (of Amber) and Mr. Wilhelm (of Reilly) resulted in a two-way promise, pursuant to which Reilly promised to provide Amber a firm price for 2004, in exchange for Amber's commitment not only to purchase its requirements from Reilly but to purchase at least as much potassium chloride as it had in 2003. (Brister Depo. at 203-205.)  Although Reilly disputes the formation of any such agreement, on summary judgment it is Amber's version of events that must be accepted.  Amber's evidence indicates that an oral requirements contract was formed.

### 2. Reilly's Argument that Exclusivity is a Necessary Element of a Requirements Contract.

Reilly argues that a requirements contract can only be formed if the buyer agrees to purchase its requirements <u>exclusively</u> from the seller.  It is undisputed here that, on occasions when Reilly could not deliver Potassium Chloride to Amber, Amber purchased potassium chloride from a different company, Mississippi Potash. (Brister Depo at 48-50.)  Mr. Brister testified that he believed Amber was obligated to purchase 100% of its needs from Reilly, unless Reilly was unable to supply.  If it appeared that Reilly would be unable to meet Amber's needs, Amber would communicate closely with Reilly to ensure that this really was the case before purchasing from Mississippi Potash. (*Id*. at 54-55.)  Reilly asserts that this arrangement precludes the existence of a requirements contract because Amber did not purchase exclusively from Reilly.

**13**

1     First, demanding exclusivity for all requirements contracts

2  is contrary to the plain language of California Commercial Code

3  section 2306, which clearly indicates that a requirements

4  contract may be formed <u>either</u> (a) when the agreed-upon quantity

5  term is for "such actual...requirements as may occur in good

6  faith" <u>or</u> (b) when the agreement is for exclusive dealing in the

7  kind of goods concerned..." (emphasis added).

8     In support of imposing an exclusivity requirement on all

9  requirements contracts, Reilly cites Volume 1 of Witkin's Summary

10  of California Law, Contracts, Chapter 1, Section 228, which

11  provides:

12          Where the proposal is to furnish all goods of a certain
           kind that the other party may need or require in a
13          certain business for a definite period, acceptance
           results in a contract. <u>Although the acceptor does not</u>
14          <u>in this situation agree to take any particular quantity</u>
           (for he or she may not need any), <u>there is</u>
15          <u>consideration, because the acceptor has parted with the</u>
           <u>right to buy the goods elsewhere</u>. (*Bartlett Springs Co.*
16          *v. Standard Box Co.* (1911) 16 C.A. 671, 672, 117 P.
           934; Tennant v. Wilde (1929) 98 C.A. 437, 454, 277 P.
17          137; *Andersen v. La Rinconada Country Club* (1935) 4
           C.A.2d 197, 199, 40 P.2d 571; Ross v. Dunne Co. (1953)
18          119 C.A.2d 690, 698, 260 P.2d 104; Advance Med.
           Diagnostic Laboratories v. Los Angeles (1976) 58 C.A.3d
19          263, 270, 129 C.R. 723, citing the text; see U.C.C.
           2306; 2 Corbin (Rev. ed.), §6.5; 3 Williston 4th,
20          §7:12; 17A Am.Jur.2d (2004 ed.), Contracts §132; 52
           Harv. L. Rev. 836; 78 Harv. L. Rev. 1212 [comprehensive
21          analysis of problems of drafting and construction]; 8
           So. Cal. L. Rev. 243; 26 A.L.R.2d 1139 [mutuality of
22          contract to furnish another with his or her needs,
           wants, desires, requirements, and the like]; 30
23          A.L.R.4th 396 [output contracts under §2-306(1) of the
           Uniform Commercial Code].)

24  But, this summary, which is part of a subchapter dedicated to

25  problems of consideration, relies upon cases in which the

26  purchaser's needs were so completely uncertain that consideration

27  was lacking.  For example, in *Anderson v. La Rinconada Country*

28  *Club*, 4 Cal. App. 2d 197, 199-200 (1935), the purchaser agreed to

**14**

take from the supplier "all the water it should need for its
lands, depending...upon seasonal and weather conditions...."
Even though the purchaser had not agreed to take any particular
quantity, a circumstance which otherwise might result in the
absence of consideration, the purchaser promised to buy water
from "no other source...." *Id*. at 199.  The *Andersen* court held
that, even though there was a chance that the purchaser would buy
nothing during the contract period, "a promise of one party to
buy of no one else is [] sufficient consideration.*" Id.; see
also*, *Bartlett Springs Co. v. Standard Box Co.,* 16 Cal App. 671,
672 (1911)("Here there is no consideration for the promise or
offer, for the promisee has not bound himself to anything, and
has incurred no legal liability at all.").

    Here, in exchange for Reilly's promise of a fixed price,
Amber promised to purchase a <u>minimum quantity</u> of potassium
chloride.  This is sufficient consideration.[1]  It is not
essential that a requirements contract containing a minimum
purchase quantity also be for exclusive dealings.

### 3.  Unconscionable Injury.

    The second requirement to establish promissory estoppel is
that the party asserting estoppel must have suffered
"unconscionable injury:

>           The doctrine of estoppel is proven where one party
>      suffers an unconscionable injury if the statute of
>      frauds is asserted to prevent enforcement of oral
>      contracts. Unconscionable injury results from denying
>      enforcement of a contract after one party is induced by
>      another party to seriously change position relying upon

---

    [1]    As a general rule "[c]onsideration may be either (1) a
benefit conferred or agreed to be conferred upon the promisor or
some other person; or (2) a detriment suffered or agreed to be
suffered by the promisee or some other person." 1 Witkin,
Contracts, Ch. I, § 203.

the oral agreement. It also occurs in cases of unjust
enrichment.

*Allied*, 203 Cal. App. 3d at 434

The undisputed evidence arguably supports a finding of
unconscionable injury.  Mr. Wilhelm testified that he knew that
Amber intended to, and in fact did, rely on the firm price for
product offered by Reilly for 2004 by entering into contracts to
supply Amber's own customers.  (Wilhelm Depo. at 100-101, 134.)
Mr. Wilhelm, of Reilly, also testified that he knew that if Amber
was unable to meet its commitments to its customer, both as to
supply and price, it would be a "very big problem" for Amber.
(*Id*. at 100-101.)  Finally, it is undisputed that Amber suffered
financial damages as a result of the alleged breach, because
Amber purchased potassium chloride from other sources at
unfavorable prices.  (Brister Decl. at ¶¶15-16.)

> **4.  Reilly's Theory that Amber Has Admitted that the
> Alleged "Promise" by Reilly was Really an
> "Assumption" Made by Amber.**

Reilly asserts that Amber's promissory estoppel claim must
fail because "Amber's witnesses have testified that the alleged
'promise' was not a promise made by Reilly, but rather an
assumption made by Plaintiff based upon the contract identified
above and their prior business relationship."  (*See* PSF #24.)  In
support of this assertion, Reilly cites the Deposition of William
Brister at paragraphs 134:15-19, 161:1-3, 205-7-11.  But, none of
these record citations support Reilly's assertion.[2]

The first citation is to page 134, lines 15-19 of the
Brister Deposition which contains the following question:

---

[2]     The court is under no obligation to search the record.
*See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

> Q.  So based upon the exchange of e-mail and your understanding as to a specific price from Reilly Industries, you made verbal commitments to Geo-Western, MI Drilling Fluid, Enterprise Drilling, and that's it; correct?

(Mr. Brister answered in the affirmative at line 20, which was not cited by Reilly.)  This exchange does not support Reilly's assertion.  In fact, it appears to confirm that Amber relied upon the firm price it received frm Reilly to enter into contracts with its customers.

The second excerpt cited by Reilly is page 161, lines 1-3 of the Brister Deposition:

> Q.  It was your assumption that it was the same it's always been; correct?
>
> A.  Been that way for 15 years.  Yes.

This exchange, on its own, is not particularly enlightening. When placed in context of the preceding and subsequent discussion, however, it is apparent that Brister was discussing whether the 2004 agreement retained a "net-90 day" payment term that had been part of the parties' previous agreements for fifteen years.  Brister indicated that it was his "assumption" that this provision was the same as it always had been.  This is far from an admission that he assumed the existence of the entire agreement.

Finally, Reilly cites page 205, lines 7-11 of the Brister Deposition:

> [Q.]  So the e-mail and the one conversation comprised the promise that's being discussed in Paragraph 19 of Exhibit 31; correct?
>
> A.  It would be the contract for 2004, yes.

Again, this excerpt is not meaningful on its own, particularly given that the cited Exhibit 31 was not presented to the Court.

Nevertheless, when placed in context, this exchange does not support Reilly's assertion.  In the preceding and subsequent pages, Brister was merely discussing the various communications that led him to believe an agreement had been reached.

### 5.  Conclusion Regarding Promissory Estoppel.

In sum, viewing the evidence in the light most favorable to Plaintiffs, an oral requirements contract was formed; exclusivity is not required; and unconscionable injury occurred.  Defendant's motion for summary judgment is **DENIED** as to the claim of promissory estoppel.

### C.  <u>The Import of the Purchase Orders and Invoices</u>.

Reilly places great weight on the fact that, prior to each shipment of potassium chloride, Amber sent Reilly a purchase order.  Then, along with each shipment, Reilly sent Amber an invoice, incorporating standard terms and conditions (the "Standard Terms"), including an integration clause, which stated that the invoice and terms and conditions constitute the parties' entire agreement and that the terms can only be amended, modified or revised through a written document executed by the partes.[3]

Reilly asserts (a) that Amber's purchase order was an "offer"; (b) that Reilly's invoice, incorporating the Standard Terms, was an acceptance of that offer; and (c) that the Standard Terms became a part of the contract.  In support of this assertion, Reilly cites California Commercial Code Section 2207, which sets forth the procedure by which additional terms contained in an acceptance or confirmation may become part of a

---

[3]    Amber vigorously disputes the admissibility of the invoices containing the Standard Terms.  For the purposes of this discussion only, the district court will assume the admissibility of those documents.

**18**

contract.[4]   Amber does not directly address Section 2207 or its

applicability here.   For the purposes of this discussion only, it

is assumed that the Standard Terms became part of a written

agreement between Amber and Reilly for each purchase.

Assuming as much, Reilly suggests that the integration

clause precludes the alleged oral agreement from having any force

and effect.   Specifically, Reilly asserts that the parol evidence

rule bars consideration of the oral agreement.   Because this is a

contract for the sale of goods, the applicable parol evidence

rule is found in California Commercial Code Section 2202, which

provides:

> Terms with respect to which the confirmatory memoranda
> of the parties agree or which are otherwise set forth
> in a writing intended by the parties as a final
> expression of their agreement with respect to such
> terms as are included therein <u>may not be contradicted
> by evidence of any prior agreement or of a
> contemporaneous oral agreement but may be explained or
> supplemented</u>
>
> (a) <u>By course of dealing, course of performance, or
> usage of trade</u> (Section 1303); and

---

[4]   Cal. Com. Code § 2207 provides, in pertinent part:

> (1) A definite and seasonable expression of acceptance
> or a written confirmation which is sent within a
> reasonable time operates as an accept ance even though
> it states terms additional to or different from those
> offered or agreed upon, unless acceptance is expressly
> made conditional on assent to the additional or
> different terms.
>
> (2) The additional terms are to be construed as
> proposals for addition to the contract. Between
> merchants such terms become part of the contract
> unless: (a) The offer expressly limits acceptance to
> the terms of the offer; (b) They materially alter it;
> or (c) Notification of objection to them has already
> been given or is given within a reasonable time after
> notice of them is received.

* * *

1

2

3

> (b) <u>By evidence of consistent additional terms unless</u>
> <u>the court finds the writing to have been intended also</u>
> <u>as a complete and exclusive statement of the terms of</u>
> <u>the agreement</u>.

4   (emphasis added).[5]  Accordingly, if the alleged oral agreement

5   contradicts the standard terms incorporated into the invoices,

6   the oral agreement must be disregarded.  However, the oral

7   agreement may be supplemented by "course of dealing, course of

8   performance, or usage of trade."  Moreover, the oral agreement

9   may provide "consistent additional terms," <u>unless</u> "the court

10  finds the writing to have been intended...as a complete and

11  exclusive statement of the terms of the agreement."  The

12  determination as to whether a contract is intended to be

13  "complete and exclusive" is a question for the court.  *Hayter*

14  *Trucking, Inc., v. Shell Western E&P, Inc.*, 18 Cal. App. 4th 1,

15  14 (1993) (discussing Cal. Code Civ. Pro. § 1856).

16      "Evidence of surrounding circumstances and prior

17  negotiations may be admitted for the limited purpose of assisting

18  the trial court in determining whether a document was intended to

19  be the final agreement of the parties superseding all other

20  transactions."  *Id.*[6]  "[C]ourts do not necessarily treat merger

21

22      [5]   California Commercial Code 2202, which applies to all
contracts for the sale of goods, slightly alters the parol

23  evidence rule as set forth in California Code of Civil Procedure
1856.  Whereas section 1856 presumed integration, section 2202

24  "assumes that a written contract does not express the full
agreement of the parties unless the court expressly so finds."

25  Cal. Com. Code § 2202, Comment 1.

26      [6]   An integration may be partial or complete.  "[T]he
parties may intend a writing to finally and completely express

27  certain terms of their agreement rather than the agreement in its
entirety. When only part of the agreement is integrated, the

28  parol evidence rule applies to that part. However, extrinsic
evidence may be used to prove elements of the agreement not
reduced to writing." *Hayter*, 18 Cal. App. 4th at 14 (citations
omitted).

or integration clauses as conclusive of whether a writing was intended by the parties to encompass the entire agreement." *Trans-Tec Asia v. M/V Harmony Container*, 435 F. Supp. 2d 1015, 1029 n. 19 (C.D. Cal. 2005).

Here, the evidence viewed in a light most favorable to Amber, indicates that the parties did not intend for the Standard Terms contained within the invoice to constitute the complete and exclusive statement of the terms of the agreement. For example, Bob Brister testified in his deposition that he had no knowledge of the Standard Terms:

> Q. And you recognize this as, basically, a Reilly invoice?
>
> A. Yeah. It looks familiar.
>
> Q. Do you see on the bottom where it says, "This sale is subject to Reilly Industries standard terms and conditions"?
>
> A. Yes, I do.
>
> Q. Did you ever notice that before –
>
> A. No.
>
> Q. -- today. Okay. Taking a look at what's attached, "Terms and Conditions of Sale Reilly Industries," have you ever seen that before?
>
> A. Not that I'm aware of.
>
> Q. Were you aware that the invoices and the product being shipped were subject to Pages -460 and -461?
>
> A. No.
>
> Q. I will represent to you that these were taken from what you produced to us.
>
> Do you see the numbers?
>
> A. I understand that. But I'm not aware of them.
>
> Q. So you are not familiar with any of the terms and conditions that are contained in Pages -460 or -461?
>
> A. No.

Q.  So you are not familiar with Paragraph 18 on Page -461?

A.  I am not familiar with these documents at all.

Q.  So in terms of what you understood, or Amber understood, to be the terms and conditions of its purchases from Reilly, you had no understanding that they incorporated these terms and conditions on Pages -- for example, on Pages -460 and -461?

A.  I had no knowledge of them.

(Brister Depo. 142-144.)  Similarly, Sandra Kay Newman, the office manager of Amber throughout the relevant time period testified, similarly, that she had never seen the "Standard Terms."  (Newman Depo. 13-14.)

Moreover, Brett Wilhelm, of Reilly, testified that the parties' practice for many years was that, in the fall of each year, Reilly would give Amber a firm price, which would govern pricing for the entire following year.  (Wilhelm Depo 107-108.) Wilhelm specifically testified that he had given Amber a firm price for the 2004 year.  (*Id*. at 108.)  Although Reilly disputes that providing a "firm price" is sufficient to establish the existence of a requirements contract, this fact, along with other evidence that suggests a requirements contract was formed, is sufficient to call into question Reilly's assertion that the Standard Terms were a complete expression of the parties' agreement(s).  Therefore, for the purposes of this motion for summary judgment, the evidence supports a finding that the agreement was <u>not</u> integrated.

The question then becomes whether the terms of the oral agreement were contradictory or supplementary to the Standard Terms.  Reilly provided no argument and no authority on this issue.  There is, in fact, no apparent conflict between the

substance of the oral agreement and the substance of any agreement that may have been reached by the documents exchanged between Amber and Reilly.  The oral agreement relates to the parties long term commitments and pricing arrangement, while the purchase orders/invoices relate to specific transactions.  Amber contends that the purchase order/invoices are reflections of the overall requirements agreement; Reilly contends otherwise.  This is a factual dispute that cannot be resolved on summary judgment.

### VI.   CONCLUSION

The alleged requirements agreement for the sale of goods is subject to the writing requirement contained in the statute of frauds.  The e-mails exchanged between the parties in the fall of 2003 are insufficient to establish the existence of a written contract, and no exception to the statute of frauds applies.  However, the evidence of an alleged oral promise made by Reilly is sufficient to raise a question of fact as to the application of promissory estoppel.  Finally, assuming, *arguendo*, that the documents exchanged between the parties formed a contract containing an integration clause, there are facts, when viewed in a light most favorable to Amber, which suggest that the parties did not intend for these documents to be a complete expression of their agreement.  Accordingly, the parol evidence rule does not bar the introduction of evidence regarding the oral agreement.  For all these reasons, Reilly's motion for summary judgment is **DENIED.**

IT IS SO ORDERED.

**Dated:   February 14, 2007**                    **/s/ Oliver W. Wanger**
b2e55c                                   UNITED STATES DISTRICT JUDGE

23